# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 351 | **DATE** | 6/12/2000 |
| **CASE TITLE** | Chu, et al. vs. Sabratek Corp., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant KPMG LLP's motion to dismiss plaintiffs' complaint [96-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUN 13 2000
date docketed

docketing deputy initials

date mailed notice

Document Number

149

RO  courtroom deputy's initials

00 JUN 12 PM 2: 45

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DENNIS CHU, AMBASSADOR WINDOW )
AND DOOR CO. PENSION PLAN AND )
TRUST, BRUCE BRAVERMAN, et al., )
Individually And On Behalf of All Others )
Similarly Situated, )

    Plaintiffs, )

    v. )

SABRATEK CORPORATION, )
K. SHAN PADDA, ANIL K. RASTOGI, )
STEVEN L. HOLDEN, DORON C. LEVITAS, )
VINCENT J. CAPPONI, ALAN E. JORDAN, )
STEPHAN C. BEAL, ELLIOT R. MANDELL, )
SCOTT P. SKOOGLUND, WILLIAM D. )
LAUTMAN, WILLIAM H. LOMICKA and )
KPMG LLP, )

    Defendants. )

No.    99 C 0351

Judge Ruben Castillo



## MEMORANDUM OPINION AND ORDER

    Plaintiff Dennis Chu, on behalf of himself and all purchasers of the publicly traded

securities of Sabratek Corporation ("Sabratek") between the period of February 25, 1997 and

October 6, 1999, seeks remedies under § 10(b) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5.[1] The plaintiffs contend that Defendant KPMG, LLP

("KPMG") knowingly or recklessly misrepresented material facts in connection with the

---

    [1] Today, we issue two opinions resolving numerous motions to dismiss. Here we decide
KMPG's motion to dismiss, ("*Chu I*"); in the second opinion we decide the individual
defendants' motions to dismiss ("*Chu II*"). Additionally, the plaintiffs have filed a motion for
class certification, which has yet to be fully briefed. We refer to the putative plaintiff class as
"the plaintiffs" throughout this opinion without expressing any conclusion about the propriety of
certifying that putative class.

purchase of Sabratek securities by certifying that Sabratek's 1997 and 1998 financial reports had been prepared in conformity with Generally Accepted Accounting Principles ("GAAP") and that it had audited Sabratek's financial statements in accordance with Generally Accepted Accounting Standards ("GAAS"). KPMG filed a motion to dismiss the plaintiffs' Third Amended Complaint ("complaint"), (R. 42-1), arguing that the plaintiffs have failed to comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedures and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). We agree with KPMG that the plaintiffs have failed to allege facts which give rise to a strong inference that KPMG either knew or recklessly disregarded Sabratek's improper revenue recognition practices. The plaintiffs have, however, alleged sufficient facts to show that KPMG either knowingly or recklessly made a material misstatement when it certified approximately $39 million of Sabratek's expenses as intangible assets in violation of GAAP and GAAS. Therefore, we grant in part and deny in part KPMG's motion to dismiss.

## FACTS

For purposes of a motion to dismiss, this Court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in favor of the plaintiffs. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996). In accordance with this standard, we recite the facts relevant to KPMG's motion.

Sabratek Corporation ("Sabratek") incorporated in 1990 with the strategic goal of becoming a comprehensive solution provider to the alternative healthcare market. In particular, Sabratek sought to create a so-called "virtual hospital room" that would enable healthcare providers to treat and monitor patients in alternate care facilities. Sabratek's products, which

include infusion pumps for the delivery of therapeutic agents and diagnostic and information systems for patient monitoring, allow healthcare providers to treat high-acuity patients in such places as long-term care facilities, outpatient centers, and patients' homes. With Sabratek's products, healthcare providers can reduce operating costs while improving the delivery and quality of care. (Compl. at ¶¶ 1, 24, 43.) Since going public in June 1996, Sabratek common stock experienced dramatic increases in price. At its highest point during the putative class period, Sabratek common stock reached the price of $38.75 per share. (Compl. at ¶¶ 2, 45.)

In the meantime, the plaintiffs contend that Sabratek's business was experiencing a number of material adverse problems. Although Sabratek repeatedly touted the benefits of its product line, Sabratek experienced significant safety and compliance problems. At all material times prior to and during the putative class period, Sabratek manufactured its line of Rocap flush syringes without Food and Drug Administration ("FDA") approvals. (Compl. at ¶ 46.) Sabratek also began to lose its customer base and experienced a growing level of customer complaints about the quality of its products. (*Id.*) The net effect of these problems was that Sabratek's supply of unsold products, specifically its infusion pumps, increased to "damagingly high levels." (Compl. at ¶ 5.) In light of these and other problems, Sabratek began to lose market share to its competitors.

The plaintiffs allege that starting no later than February 25, 1997, the defendants, including KPMG, engaged in an elaborate accounting scheme to conceal Sabratek's declining sales and other profit-related problems. KPMG was the consultant and auditor who certified Sabratek's 1997 and 1998 annual financial statements, which were filed with the SEC and disseminated to the public. The plaintiffs allege, inter alia, that Sabratek engaged (and KPMG

acquiesced) in numerous improper revenue-inflating and expense-deflating practices in violation of GAAP. Sabratek's improper practices included: (1) recognizing revenue on "phony sales" of products to entities that had not ordered Sabratek products; (2) recognizing revenue on "inventory parking arrangements"; (3) booking revenue on "consignment sales" where no bona fide purchase had been made; (4) backdating invoices for premature revenue recognition; (5) concealing substantial credits, discounts, and/or rebates offered to distributors; and (6) paying itself "consulting fees" for fictitious consulting services where no money ever exchanged hands and no invoices were ever generated. (Compl. at ¶¶ 6, 48-51.)

In addition, the plaintiffs allege that Sabratek, with the approval of KPMG, structured various fraudulent transactions with four entities: Unitron Medical Communications, Inc. ("Unitron"), GDS Technology, Inc. ("GDS"), Healthmagic, Inc. ("Magic"), and Collaborations in Healthcare, LLC ("Healthcare"). Through their transactions with Unitron, GDS, Magic, and Healthcare (collectively "R&D Satellite Entities"), Sabratek reported approximately $39 million of cash disbursements and research expenses as licensing deals, loans, and other "intangible assets."[2] (Compl. at ¶ 53.)

Sabratek's improper accounting practices artificially depressed Sabratek's expenses and inflated its reported revenues, income, and earnings per share. Sabratek reported its inflated figures on its quarterly and annual financial forms, which received positive market feedback. But on October 7, 1999, after delaying its second quarter financial statements by two months, Sabratek announced that its previously reported earnings, as reflected in its 1997 and 1998

---

[2] Sabratek paid Unitron $18.5 million, GDS $10.4 million, Magic $10 million, and CIH $2.7 million throughout the putative class period.

financial statements, had been overstated by approximately $39 million. Sabratek also announced that its board was considering certain unspecified "other accounting issues" that had been raised by Sabratek's CFO. Sabratek's closing stock price of $1.03 per share on October 7, 1999 represented a dramatic decline of more than 97% from its class period high of $38.75 per share in September 1997. (Compl. at ¶¶ 13, 164.) On November 17, 1999 the plaintiffs filed this complaint, (R. 42).

## STANDARD OF REVIEW

KPMG's motion to dismiss the plaintiffs' securities fraud complaint implicates the Federal Rules of Civil Procedure 12(b)(6) and 9(b) as well as the PSLRA. Under Rule 12(b)(6), we will dismiss a complaint for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Maple Lanes, Inc. v. Messer*, 186 F.3d 823, 824-25 (7th Cir. 1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). On a motion to dismiss, this Court draws all inferences and resolves all ambiguities in favor of the plaintiffs and assumes that all well-pleaded facts are true. *See Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (citation omitted).

Rule 9(b) requires plaintiffs to plead "the circumstances constituting fraud . . . with particularity." *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). As a policy matter, the heightened pleading requirements under Rule 9(b) serves three main purposes: "to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the

claims against them." *Fugman v. Aprogenex*, 961 F. Supp. 1190, 1194 (N.D. Ill. 1997) (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)).

In addition to the Rule 9(b) requirement, the PSLRA amendments to the Exchange Act raise the pleading standards in securities fraud cases, requiring the plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA also requires the plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78-4(b)(1).

With these standards in mind, this Courts takes as true all well-pleaded facts of the complaint, but we will dismiss the claim if it fails to satisfy the heightened pleading requirements of Rule 9(b) or the PSLRA.

## ANALYSIS

KPMG moves to dismiss the plaintiffs' complaint for a failure to state a securities fraud claim under the heightened pleading requirements of Rule 9(b) and the PSLRA. (Mot. to Dismiss at 2.) The Seventh Circuit has explained that in order to state a claim under § 10(b) of the Exchange Act, a plaintiff must allege that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff has relied and (6) that reliance proximately caused plaintiff's injuries." *In re HealthCare Compare*, 75 F.3d at 280. KPMG argues that the plaintiffs have failed to plead with particularity that KPMG made a misstatement of material fact.[3] KPMG also

---

[3] Although the plaintiffs devote much of the complaint to Sabratek's FDA regulatory problems regarding its Rocap division, the plaintiffs do not allege that Sabratek's financial

asserts that the plaintiffs have failed to allege facts which give rise to a strong inference that it acted with the requisite state of mind.

## I.    KPMG's Misleading Statements of Material Fact

KPMG first contends that the plaintiffs' allegations concerning Sabratek's allegedly improper financial statements do not establish that KPMG made a misstatement of material fact. In particular, KPMG argues that the plaintiffs have failed to plead with particularity "what" was materially misstated in the financial statements, "why" its audit reports were misleading, and "how" the financial statements and KPMG's audit of those statements violated GAAP and GAAS. *See DiLeo*, 901 F.2d at 627. As a threshold matter, under § 10(b) the plaintiffs must sufficiently allege that KPMG either made a false statement of material fact or omitted a material fact that rendered an affirmative statement misleading. *See Searles v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995). A misstatement or omission is material if there was a "substantial likelihood that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Financial statements filed with the SEC that do not conform to the requirements of GAAP are presumptively misleading and inaccurate pursuant to SEC regulation. *See* 17 C.F.R. 210.4-01 (a)(1). Without a "misstatement of material fact," we will dismiss a § 10(b) complaint.

---

statements were materially affected by these problems. Thus, for the purposes of KPMG's motion to dismiss, we limit our inquiry to the plaintiffs' allegations regarding Sabratek's improper revenue recognition practices and transactions with the R&D Satellite Entities.

After examining the plaintiffs' allegations, we find unpersuasive KPMG's arguments that the plaintiffs have failed to plead with particularity "what," "why," or "how" KPMG's certifications of Sabratek's financial statements were material misstatements. Under the Rule 9(b) and PSLRA pleading requirements, the plaintiffs must with particularity "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." The complaint specifies that each of KPMG's 1997 and 1998 audit reports was false in that KPMG stated that it had conducted Sabratek's audits in conformity with GAAS and that, in its opinion, Sabratek's 1997 and 1998 financial statements were fairly presented, in all material aspects, in accordance with GAAP. The complaint also sufficiently states the reasons the financial statements contained materially misleading statements: the financial statements misrepresented Sabratek's true earnings by recognizing revenue on "phony sales" and erroneously classifying $39 million in expenses as intangible assets.

## A. KPMG's Certifications Regarding Sabratek's Inflated Earnings

We first note, but reject, KPMG's argument that the plaintiffs have failed to specify how its certified financial statements and audit reports violated GAAP and GAAS. KPMG contends, for example, that there is nothing inherently wrong about Sabratek's so-called "revenue inflating" practices. (Mot. to Dismiss at 5). KPMG correctly notes that "there is nothing inherently improper in pressing for sales to be made earlier than in the normal course [of business]," even if doing so is "likely to the detriment of earnings in later quarters." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999). We agree with KPMG that GAAP does provide for some flexibility in the timing of revenue recognition.

However, drawing all reasonable inferences in favor of the plaintiffs, we believe that they have sufficiently alleged that Sabratek's revenue recognition practices violated GAAP. In the complaint, the plaintiffs point to several instances when Sabratek, in violation of GAAP, recognized revenue on transactions even though collection was not reasonably assured. (Compl. at ¶ 183.) In December 1997, Sabratek induced Medical Specialties, Inc. to receive $1.2 million worth of Sabratek pumps by promising that it could return the pumps at the end of 1998 for full credit. In March 1998, Sabratek shipped almost $1 million worth of inventory to Tacy Medical of Fernandina Beach, Florida, even though Tacy Medical had never ordered or previously distributed the products. (Compl. at ¶ 48.) Also in 1998, Sabratek induced Coram to receive $1 to $1.5 million worth of excess inventory for which Coram had no current demand. (*Id.*) Another such company, Amtec, received "so many [unordered] excess Sabratek pumps that they used them as impromptu workspace dividers." (*Id.*) These allegations, if true, would show that Sabratek materially inflated reported revenues in violation of GAAP.[4]

As the complaint stands, the plaintiffs have specified "each statement alleged to have been misleading" (that Sabratek's 1997 and 1998 financial statements were in accordance with

---

[4] *See Cooper v. Pickett*, 137 F.3d 616, 626-27 (9th Cir. 1997) (a company that "overstates its revenues by reporting consignment transactions as sales . . . make[s] false or misleading statements of material facts"); *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) ("We cannot find a single precedent . . . holding that a company may . . . substantially overstate its revenue by reporting consignment transactions as sales without running afoul of Rule 10b-5"); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572-76 (2d Cir. 1982) (reporting consignment transactions as sales violates GAAP and § 10(b)); *Danis v. USN Communications, Inc.*, 73 F. Supp.2d 923, 935 (N.D. Ill. 1999) (holding that recognition of revenue on fictitious sales violates GAAP and § 10(b)); *Bell v. Fore Sys., Inc.*, 17 F. Supp.2d 433, 440 (W.D. Pa. 1998) (concluding that claims that defendant engaged in "inventory parking" arrangements adequately alleged violation of both GAAP and § 10(b)).

GAAP) and "the reason or reasons why the statement is misleading" (Sabratek recognized false revenue in violation of GAAP). Although we agree with KPMG that the plaintiffs have failed to allege several details regarding Sabratek's allegedly improper revenue recognition practices, such as the dollar amounts by which Sabratek's financial statements have been misstated as a result of these transactions, the plaintiffs have alleged sufficient facts to meet their burden at this stage in the litigation. *See, e.g., Danis*, 73 F. Supp.2d at 935, n.6 ("Plaintiffs need not state the amount by which USN's financial statements were in error."); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *8-9 (N.D. Ill. Nov. 4, 1998) (agreeing that Rule 9(b) does not require the plaintiffs to describe the precise amount of overstatement). Having satisfied the Rule 9(b) and the PSLRA's pleading requirements, the plaintiffs need not allege such additional details to survive a motion to dismiss.

**B.     KPMG's Certifications Regarding Sabratek's Transactions with the Research and Development Satellite Entities**

Similarly, the plaintiffs adequately allege that KPMG made a "misstatement of material fact" in that KPMG erroneously certified that Sabratek "fairly presented" approximately $39 million dollars in expenses as intangible assets. GAAP requires research and development costs to be treated as "expenses" and precludes capitalizing the value of a purported "asset" unless it has a probable future economic benefit. (Compl. at ¶¶ 176-83.) Although the plaintiffs have not specified the exact manner by which Sabratek structured its deals, the lack of that detail is not fatal to meet the "material misstatement" element of the § 10(b) claim. As it stands, the plaintiffs have specified that Sabratek either never acquired any licensing rights for the money it paid or that the licensing rights it did receive were for products that were still in development. Under

either scenario, the plaintiffs have alleged which portions of Sabratek's financial statements were overstated (the intangible assets) and which portions were understated (the research and development related expenses) in violation of GAAP. *See, e.g., Danis*, 73 F. Supp.2d at 935. "This is sufficient to permit defendants to prepare a defense to the allegation." *Id.* The plaintiffs not only identify each of the R&D Satellite Entities and the nature of each suspected transaction, but also plead the dollar amounts of each cash disbursement, the aggregate dollar amount by which Sabratek's assets were correspondingly misstated, and the dates of each of the alleged "loans" and "licensing" transactions. (Compl. at ¶ 55.)

Having concluded that the plaintiffs have adequately alleged that KPMG "made a misstatement of material fact," we inquire as to whether the plaintiffs have alleged "facts which give rise to a strong inference" that KPMG acted with the requisite intent.

## II.    KPMG's Scienter

KPMG contends that the plaintiffs' claim must fail because the facts alleged do not support a finding of "a strong inference" of scienter. Scienter, as applied to securities fraud claims, refers to a mental state embracing the intent to deceive, manipulate or defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Seventh Circuit has long since interpreted *Hochfelder* as establishing that "reckless disregard for the truth counts as intent" for the purpose of the § 10(b) scienter requirement. *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (citing *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45(1977)).

The PSLRA amendments did not change the substantive provision of the Exchange Act's scienter requirement.[5] Every court in this district that has construed the scienter requirement after the PSLRA has concluded that allegations of recklessness continue to be sufficient to state a claim under § 10(b). *See, e.g., In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, *14 (N.D. Ill. Mar. 8, 2000); *Danis*, 73 F. Supp.2d at 937-38; *In re Spyglass Inc. Sec. Litig.*, No. 99 C 512, 1999 WL 543197, at *7 (N.D. Ill. July 21, 1999). At a minimum, recklessness requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). As applied to outside auditors, recklessness means that "the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re First Merchants*, 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998) (citing *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)); *see also Rehm*, 954 F. Supp. at 1255.

While not changing the substantive requirements, the PSLRA did heighten the pleading requirements of the Exchange Act's scienter requirement. A post-PSLRA securities fraud plaintiff must "state with particularity facts giving rise to a strong inference that the defendant

---

[5] *See Greebel*, 194 F.3d at 199-200; *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 552-53 (6th Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999).

acted with the required state of mind." 15 U.S.C. § 78-4(b)(2). The PSLRA does not elaborate on what facts or factual situations will give rise to "a strong inference" of intent, and the Seventh Circuit has not yet addressed the PSLRA pleading standard. As a threshold matter, this Court notes that the language of the PSLRA imposes a stricter pleading standard than that imposed by Rule 9(b). The Rule 9(b) standard required securities fraud plaintiffs to allege facts and circumstances which gave rise to "a basis for believing that plaintiffs could prove scienter." *DiLeo*, 901 F.2d at 628-29. Under the PSLRA, securities fraud plaintiffs must allege facts that afford "a strong inference" for believing that plaintiffs could prove scienter.

As to the particular contours of the factual pleading requirements, there is remarkable discord among the Circuit Courts.[6] Several courts in this district have characterized the PSLRA as effectively codifying the standard employed by the Second Circuit. *Danis*, 73 F. Supp.2d at 936-37 (N.D. Ill. 1999) (quoting *O'Brien Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)); *In re First Merchants*, 1998 WL 781118, at *9. Under the Second Circuit's pleading requirements, a plaintiff may allege scienter by either (1) showing that the defendants had both the motive and opportunity to commit fraud or (2) establishing strong circumstantial evidence of conscious behavior or recklessness. *See, e.g., Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).

---

[6] Circuit Courts have interpreted the pleading standard under the PSLRA to varying degrees of stringency. *Compare In re Advanta Corp Sec. Litig.*, 180 F.3d at 533 (3rd Cir.) (PSLRA "establishes a pleading standard approximately equal in stringency to that of the Second Circuit"), *with Bryant*, 187 F.3d at 1282 (11th Cir.) (PSLRA does not codify the "motive and opportunity" test formulated by the Second Circuit for pleading scienter), *and with In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) ("mere motive and opportunity" is never enough to establish scienter).

Although this Court finds the Second Circuit's standard instructive, we note that the PSLRA's only requirement is that the facts alleged must give rise to a "strong inference" of the defendant's scienter. The *types* of facts with which a plaintiff pleads scienter factor little into our analysis, as long the overall facts give rise to a "a strong inference" of scienter. Thus, a plaintiff may use "motive and opportunity" or "circumstantial evidence" to establish scienter under the PSLRA, as long as those facts support a strong inference "that the defendant acted recklessly or knowingly." *See Danis*, 73 F. Supp.2d at 927 (quoting *In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 551).

### A.     KPMG's Scienter Regarding Sabratek's Inflated Earnings

KPMG correctly points out what is not enough to raise a strong inference of scienter. A company's overstatement of earnings, revenues, or assets in violation of GAAP does not itself establish scienter. *See, e.g., Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996); *In re Software Toolworks*, 50 F.3d 615, 627-28 (9th Cir. 1994); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994); *Health Management*, 970 F. Supp. at 203; *Rehm*, 954 F. Supp. at 1256. In securities fraud cases, a plaintiff may not simply allege "fraud by hindsight" or point to the "before" and the "after" to show that the defendants must have intended to defraud them. *See DiLeo*, 901 F.2d at 628 (citation omitted). Thus, although plaintiffs have sufficiently alleged that KPMG made material misrepresentations, the plaintiffs still face a much tougher burden of alleging facts that give rise to a strong inference that KPMG made those misrepresentations with knowledge or reckless disregard of the truth.

As to KPMG's misstatements about Sabratek's inflated earnings, we conclude that the plaintiffs have not met their pleading requirements. In fact, the plaintiffs do not allege any facts

beyond the simple fact of Sabratek's GAAP violations to show that KPMG certified Sabratek's financial statements with the requisite intent. Thus, Sabratek's allegedly improper revenue recognition practices cannot give rise to a strong inference that, in rendering its opinion on Sabratek's financial statements, KPMG acted with fraudulent intent.

**B.** **KPMG's Scienter Regarding Sabratek's Transactions with the R&D Satellite Entities**

The plaintiffs have, however, alleged specific facts which give rise to a strong inference that KPMG either participated in, knew about, or deliberately ignored numerous warning signs of Sabratek's financial misstatements with the R&D Satellite Companies. Although violations of GAAP generally are not sufficient standing alone to establish scienter, "when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996); *Danis*, 73 F. Supp.2d at 941-42. Allegations of obvious "red flags" or warning signs that financial reports are misstated, as well as the magnitude of the fraud alleged, can give rise to a strong inference of fraudulent intent. *Miller*, 9 F. Supp.2d at 928 (deliberately ignoring "red flags" such as the rapid and unexplained increase in the cost per pound of carried inventory "can constitute the sort of recklessness necessary to support § 10(b) liability"); *Rehm*, 954 F. Supp. at 1256 ("[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy"); *In re Health Management*, 970 F. Supp. at 203 (finding that allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent).

The plaintiffs have stated sufficient facts to raise a strong inference that KPMG either knew about or recklessly disregarded information about Sabratek's material misstatements with regard to research and development expenditures. In March 1999, K. Shan Padda ("Padda"), Sabratek's CEO and Chairman of the Board during the class period, told one of Sabratek's shareholders that Sabratek and KPMG had developed a "brilliant strategy" to fund Sabratek's research and development costs "off the balance sheet" by transferring its expenses to Unitron, GDS, and Magic as licensing or loan agreements. Padda explained to the shareholder that Sabratek and KPMG had structured these deals so that the later impact of eliminating any false assets from its books would be offset by the benefits of earnings from the finished products. (Compl. at ¶ 188(a).) Similarly, Padda represented to other Sabratek shareholders that KPMG worked as a paid consultant on the Unitron and GDS licensing agreements and that KPMG's consulting advice in connection with those transactions was the cause of the $39 million in accounting restatement announced on October 7, 1999.

Moreover, according to a former Unitron employee familiar with the events that led up to the signing of the "licensing agreement" between Unitron and Sabratek, Sabratek informed Unitron during the negotiations that it would not do the deal "until its auditors [KPMG] signed off on it." Steven Holden, Sabratek's CFO at the time, told Unitron management during negotiations that any agreement would be submitted to KPMG for its review, and that Sabratek "couldn't do the deal as a licensing agreement until its auditors said it was kosher." Holden thereafter informed Unitron that KPMG had in fact "signed off" on the deal. (Compl. at ¶ 188(c).)

The plaintiffs also point to other factors that would have caused all but the most reckless auditor to subject these transactions to heightened scrutiny. When Sabratek signed the licensing agreements with Unitron and GDS, the $7 million Unitron deal and the $4 million GDS deal represented an overall 242% increase in Sabratek's reported intangible assets. The decision not to expense these deals as research and development expenses effectively saved Sabratek's reported net income of $7.2 million for 1997. (Compl. at ¶ 189(a).) Yet, Unitron was a developmental stage company with no marketable products and virtually no customers. Unitron's only major product, the MOON network system, was only just entering the testing phase and was at least 18 months away from entering the market. (Compl. at ¶ 189(b).)

The magnitude of the fraud alleged combined with the allegation that KPMG participated in structuring the suspect deals suggests a deliberate ignorance or perhaps even knowledge on the part of KPMG. In so concluding, we emphasize that this is still the pleading stage of the case. Our decision today expresses no opinion as to the truth of the allegations or the plaintiffs' ability to produce evidence establishing the facts as alleged. But, with respect to the plaintiffs' claim that KPMG fraudulently certified Sabratek's financial statements about its intangible assets, the allegations are sufficient to withstand KPMG's motion to dismiss.

## III.  Reliance of Sabratek Convertible Note Holders

KPMG finally argues that claims by the Sabratek convertible note purchasers should be dismissed for failure to allege the essential element of reliance. As KPMG contends, some form of reliance or causal nexus is an essential element of a § 10(b) cause of action. *See Basic v. Levinson*, 485 U.S. at 489; *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). Without allegations of some causal connection between the defendant's material misstatement

and the plaintiff's injury, the plaintiffs cannot survive a motion to dismiss. In the absence of actual reliance, however, "an alternative method of establishing causation – an effect on the market price" may support recovery by plaintiffs who never actually read or relied on the defendant's alleged misstatements. *See Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir. 1993).

In addressing KPMG's arguments, we first conclude that the plaintiffs have sufficiently pleaded actual reliance on KPMG's misstatements. (Reply at 3.) Although the plaintiffs do not explicitly state that they "received or read KPMG's audit reports," (Reply at 7), the plaintiffs do specify that they relied "directly or indirectly on the false and misleading statements made by [KPMG]" and that because of KPMG's misstatements, the plaintiffs "acquired Sabratek's securities . . . at artificially high prices and were damaged thereby." (Compl. at ¶ 212.) The plaintiffs allege that they were ignorant of the falsity of KPMG's statements and that they had erroneously believed them to be true. (Compl. at ¶ 213.) Had the plaintiffs known Sabratek's true financial conditions, which KPMG misstated, they "would not have purchased or otherwise acquired their Sabratek securities." (*Id.*) These allegations are sufficient to withstand KPMG's motion to dismiss.

Further, contrary to KPMG's contentions, the plaintiffs have pleaded sufficient facts to establish a rebuttable presumption of reliance based on the fraud-on-the-market theory. KPMG contends that because the plaintiffs have not pleaded that an efficient market exists for Sabratek convertible notes, the plaintiffs are not entitled to a presumption of reliance under the fraud-on-the-market theory. (Mot. to Dismiss at 18). As explained by the Supreme Court,

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (citation omitted).

The plaintiffs argue, and KPMG concedes, that "the question on a motion to dismiss is not whether [the] plaintiff has proved an efficient market, but whether *he has pleaded one*." *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992) (emphasis added). KPMG correctly notes that the complaint does not specifically allege that Sabratek convertible notes were traded in an "efficient market." (Mot. to Dismiss at 19.) The complaint does state, however, that the notes were convertible into Sabratek common stock, presumably at the will of the note holder, at a specified dollar amount. (Compl. at ¶ 100.) The plaintiffs also explicitly detail the existence of an efficient market for Sabratek common stock. (Compl. at ¶¶ 201-02.) From these allegations, the Court may infer the existence of an efficient market for Sabratek's convertible notes. Millions of shares of Sabratek common stock were traded on the Nasdaq National Exchange, and Sabratek was followed by several securities analysts employed by major brokerage firms. Inasmuch as there existed an efficient market for Sabratek common stock, this Court also concludes that an efficient market existed for Sabratek convertible notes, which were convertible to Sabratek common stock.

Therefore, we conclude that Sabratek convertible note purchasers have sufficiently alleged reliance and deny KPMG's motion to dismiss their claim.

## CONCLUSION

KPMG's motion to dismiss the plaintiffs' complaint, (R. 96-1), is granted in part and denied in part as indicated herein. As explained in *Chu II*, an amended complaint that conforms to this opinion will be due on or before August 4, 2000.

A status hearing will be held in open court on August 9, 2000 at 9:45 a.m.

Entered:

Judge Ruben Castillo
United States District Court

Date: June 12, 2000