# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 351 | **DATE** | 6/12/2000 |
| **CASE TITLE** | Chu, et al. vs. Sabratek Corp., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/9/2000 at 9:45 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. The third amended complaint is dismissed without prejudice to the filing of an amended complaint on or before 8/4/00. Defendants motions to dismiss [81-1, 82-1, 83-1, 85-1, 86-1, 87-1, 88-1, 89-1, 90-1, 91-1 and 96-1] are all granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUN 13 2000 | |
| ✓ | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| RO | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DENNIS CHU, AMBASSADOR WINDOW AND DOOR COMPANY PENSION PLAN AND TRUST, and BRUCE BRAVERMAN, et al., individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>SABRATEK CORPORATION, K. SHAN PADDA, ANIL K. RASTOGI, STEVEN L. HOLDEN, DORON C. LEVITAS, VINCENT J. CAPPONI, ALAN E. JORDAN, STEPHAN C. BEAL, ELLIOT R. MANDELL, SCOTT P. SKOOGLUND, WILLIAM C. LAUTMAN, WILLIAM H. LOMICKA, and KPMG LLP,<br><br>  Defendants. | No. 99 C 351<br><br>Judge Ruben Castillo |

RECEIVED
JUN 13 2000

## <u>MEMORANDUM OPINION AND ORDER</u>

Today we issue two opinions resolving various motions to dismiss this securities fraud lawsuit. The first opinion denies in part and grants in part Defendant KPMG's motion to dismiss the claims against it, ("*Chu I*"). In this opinion, ("*Chu II*"), we resolve motions to dismiss by each of the remaining individual defendants.[1] (R. 81-1 (Levitas' motion), 82-1 (Lautman and Lomicka's joint motion), 83-1 (Holden's motion), 85-1 (Padda's motion), 86-1 (Skooglund's motion), 87-1 (Mandell's motion), 88-1 (Capponi's motion), 89-1 (Jordan's motion), 90-1 (Beal's motion), and 91-1 (Rastogi's motion).) The individual defendants were all officers or

---

[1] Two of the originally named defendants, Peter L. Smith and Stephen L. Axel, were dismissed without prejudice at the behest of the parties. (*See* R. 102, Order of Feb. 29, 2000 (dismissing Smith); R. 109, Order of Mar. 21, 2000 (dismissing Axel).)



directors of Sabratek Corporation, a company that manufactured and sold medical supplies for home health care services and that is currently engaged in bankruptcy proceedings.[2]

The plaintiffs[3] allege three violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against the individual defendants both directly and pursuant to a theory of control person liability, 15 U.S.C. § 78t(a). The plaintiffs claim that the individual defendants made false statements regarding imminent FDA approval of Sabratek's IV flush syringe product line; improperly declared research and development expenditures as "intangible assets"; and artificially inflated the company's reported income from infusion pump sales by various "channel stuffing" activities. According to the complaint, Sabratek stock prices sky-rocketed as a result of these false statements and the class members were harmed by purchasing the stock at artificially high prices.

The individual defendants maintain that the complaint – actually the third amended complaint, (R. 42) – fails to state any claims against them because (1) all of Sabratek's statements regarding FDA approval of the flush syringes fall within the Act's safe harbour provision for forward-looking statements and (2) the complaint does not allege scienter with sufficient particularity against any individual defendant on the accounting claims.[4] Additionally,

---

[2] For this reason, the case against Sabratek is stayed pursuant to the automatic stay provisions of the United States Bankruptcy Code, 11 U.S.C. § 362. (*See* R. 68, Order of Jan. 12, 2000.)

[3] We have not yet received full briefing on the plaintiffs' motion for class certification and, thus, have not decided whether this lawsuit is properly brought as a class action.

[4] Regarding claims by holders of Sabratek convertible notes, the individual defendants argue that the complaint fails to allege either an efficient market for the notes or reliance by the

(continued...)

several of the individual defendants contend that the plaintiffs failed to adequately plead control person liability with respect to themselves.[5]

## BACKGROUND

When deciding a motion to dismiss, this Court must accept all well-pleaded factual allegations in the complaint as true. We must also draw all reasonable inferences in favor of the plaintiffs.[6] In addition to considering the factual allegations in the complaint, we may also consult documents referred to in the complaint. Before analyzing the substance of the pending motions, we first introduce the parties and the claims.

### I. The Plaintiffs

The plaintiffs in this action fall into two categories: those who purchased Sabratek common stock between February 25, 1997, when Sabratek purchased Rocap, Inc., and October 6, 1999, the day before the public learned that Sabratek overstated its earning by more than $39 million; and those who purchased Sabratek's convertible notes between April 8, 1998, when the notes were offered, and October 6, 1999, when it became clear the notes were virtually worthless.

### II. The Individual Defendants

---

[4](...continued)
note purchasers. This argument is resolved in *Chu I* and we will not repeat that analysis here.

[5] The individual defendants submitted joint memoranda in support of their motions to dismiss presenting arguments generally applicable to them all. Each individual defendant also filed briefs setting forth contentions unique to himself.

[6] For this reason, we recite the factual allegations as though they are established, without using conditional language such as "purportedly" or "allegedly." Our use of this technique, however, does not express any opinion regarding the veracity of the plaintiffs' allegations or the plaintiffs' ability to produce evidence establishing the facts recited here.

The individual defendants were all officers or directors of Sabratek. According to the complaint, K. Shan Padda was Sabratek's Chief Executive Officer and Chairman of the Board until his resignation on August 23, 1999; Anil K. Rastogi was its President and Chief Operating Officer until his resignation in July 1998; Steven L. Holden was a senior vice president and Chief Financial Officer until July 1998, when he became the President and Treasurer; Doron C. Levitas was Sabratek's Vice President, Chief Administrative Officer, Secretary, and Vice Chairman of the Board until his resignation on August 23, 1999; Vincent J. Capponi was the Vice President of Operations until July 1998, when he became the Vice President and Chief Operating Officer; Alan E. Jordan was the Senior Vice President of Sales and Marketing until July 1998; Stephen C. Beal was the Vice President of Sales; Elliott R. Mandell was Vice President and President of the Rocap Division; Scott P. Skooglund was the Vice President of Finance and Principal Accounting Officer; William H. Lomicka and William D. Lautman were Sabratek Directors who constituted the Board's Audit Committee. (Compl. at ¶ 25.)

The plaintiffs contend that each of the individual defendants owned Sabratek stock and improperly prospered by selling that stock at artificially inflated prices. (Compl. at ¶ 200.) Additionally, the plaintiffs assert that, due to their status as upper echelon managers and directors, the individual defendants knew of and participated in Sabratek's dissemination of false information that caused the artificially high stock prices.

## III. The Claims

The plaintiffs allege three basic § 10(b) violations: the defendants lied about FDA approval for its line of IV flush syringes, falsely declared income from its infusion pump product

line, and falsely declared income from "intangible assets." We recite briefly the factual allegations underlying each claim.

## A. FDA Approval of Sabratek's IV Flush Syringes

On February 25, 1997, Sabratek purchased the assets of Rocap, Inc., for $100,000 in cash, assumption of $961,000 Rocap debt, and $2.9 million in Sabratek stock to be valued on July 1, 1997. (Compl. at ¶ 73.) Rocap manufactured two products: IV flush syringes and infusion pumps. IV flush syringes are used to clean intravenous tubes. Rocap constructed the syringes using FDA-approved component parts – specifically, syringes, saline, and in some cases heparin, an anticoagulant. At the time of the purchase, the flush syringes were regulated by the FDA as a "drug," but in April 1997 the FDA notified Sabratek that, in the future, the syringes would be regulated as a "medical device." Because of the change in classification, the FDA asked Sabratek to submit a 510(k) application establishing that the syringes were "substantially equivalent to" already approved devices or drugs. (R. 93, Defs.' Ex. B, Feb. 24, 1998 FDA Report at 10.) At that time, the FDA informed Sabratek that it would take no action against the syringes until the 510(k) application was decided. (*Id.* at 11.) In May 1997, Sabratek submitted a 510(k) application for the syringes.

The FDA inspected Sabratek's flush syringe facilities in August and September 1997. In December 1997, the FDA warned Sabratek that its manufacture of the syringes did not comply with federal regulations and memorialized those warnings in the February 24, 1998 Report. In July 1998, the FDA again inspected the flush syringe production and, according to an August 1998 letter to Sabratek, found continuing violations. Finally, on November 24, 1998, Sabratek suspended production and distribution of the flush syringes, probably because the FDA denied its

510(k) application. The announcement resulted in a $9 per share dip in the price of Sabratek's stock. (Compl. at ¶ 139.)

Throughout this period, Sabratek downplayed the seriousness, or even existence, of its regulatory difficulties. It issued two press releases, quoting Rastogi and Holden, stating that the company had addressed all of the FDA's concerns and that Sabratek had no reservations about the safety of the syringes. Additionally, Sabratek repeatedly cited the Rocap products, including the flush syringe line, as a major reason for its economic strength and continued growth. Further, in its 1997 and 1998 Form 10-Ks, the company stated that it, and its subsidiaries, maintained "comprehensive quality assurance programs," tested all finished products, and complied with all federal regulations.

Ultimately, on May 27, 1999, the FDA approved Sabratek's revised 510(k) application for its saline IV flush syringes; then, on December 10, 1999, Sabratek received approval for its heparin IV flush syringes.

## B. Sabratek's Declaration of Intangible Assets

The plaintiffs contend that between April 1, 1997 and March 31, 1999 Sabratek improperly reported more than $39 million in "licensing fees" and "loans" to four entities when that money actually was used to support research and development activities. According to the plaintiffs, Sabratek accounted for that money as "intangible assets" on its 1997 and 1998 Form 10-Ks, putting it in the plus column, rather than properly denoting the money as expenses. Specifically, the plaintiffs allege that Sabratek paid Unitron Medical Communications, Inc., a total of $18.5 million, consisting of $8.8 million in loans, $7 million in licensing fee payments, and $2.7 million under a sales and marketing agreement. Similarly, Sabratek paid GDS

Technology, Inc., a total of $10.4 million, consisting of at least $6.5 million for exclusive product rights; Healthmagic, Inc., a total of $10 million for licensing fees; and Collaborations in Healthcare, LLC, a total of $2.7 million for draws under a credit facility. (Compl. at ¶ 54 n.5.)

The plaintiffs allege that Sabratek's accounting of this money was false and that the money was actually used for research and development of products intended for use in Sabratek's planned "virtual hospital room." They contend that none of the four entities was ever expected to repay the "loans" and that none produced anything that could be licensed; instead Sabratek merely financed their development of products Sabratek wanted developed. According to generally accepted accounting practices, a company must report research and development funds as expenses. On October 7, 1999, Sabratek announced that it was restating its earlier financial statements and reducing its reported earnings by $39 million. (Compl. at ¶ 163.)

## C. Sabratek's Improper Reporting of Income on Infusion Pump Sales

The plaintiffs allege that Sabratek improperly reported revenue on consignment sales and nonconforming or defective shipments of infusion pumps. Additionally, Sabratek reported income from inventory "parked" with "friendly warehouse operators" and back-dated invoices so as to credit "sales" of the pumps in earlier fiscal reporting periods. Finally, Sabratek convinced some of its distributors to accept large shipments of its infusion pumps (and recorded these as sales), even though, at the time, the distributors did not have buyers for those products. (Compl. at ¶¶ 48(a)-(f), 50.)

The plaintiffs do not allege that any replacement shipments for the nonconforming shipments were also recorded as sales. Likewise, they do not allege that the products sold on

consignment, the parked inventory, or pre-buyer shipments were not subsequently sold or subtracted from reported earnings.

## ANALYSIS

This Court must determine whether the plaintiffs have adequately stated a claim for relief under § 10(b). We will dismiss the complaint only if it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief. Thus, we must analyze whether the plaintiffs have adequately alleged facts supporting their claim that the individual defendants committed securities fraud by misleading investors as to the probability of FDA approval for the IV flush syringes and by the various accounting improprieties outlined above.

Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead the circumstances constituting fraud with particularity. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 910 F.2d 624, 627 (7th Cir. 1990).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes even more stringent pleading standards on private plaintiffs seeking relief under § 10(b). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1). More importantly, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind." § 78u-4(b)(2); *see also* § 78u-4(b)(3)(A) ("In any private action arising under this chapter, the court shall, on motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.").

As explained more fully in *Chu I*, the requisite state of mind in securities fraud cases is recklessness. Thus, plaintiffs must allege with particularity "'conduct which is highly

unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Danis v. USN Communications, Inc.*, 73 F. Supp.2d 923, 938 (N.D. Ill. 1999) (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997)).

With these standards in mind, we turn to the individual defendants' arguments: first, those regarding FDA approval for the flush syringes and, then, those regarding Sabratek's accounting practices.

## I. Statements About FDA Approval for Sabratek's Flush Syringes

The individual defendants contend that the plaintiffs' allegations regarding FDA approval of the flush syringes do not state a claim because each of Sabratek's statements was forward looking and properly identified as such. The PSLRA protects forward-looking statements against charges of fraud "to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ." 15 U.S.C. § 78u-5(c)(1)(A)(i); *see also* 17 C.F.R § 240.3b-6 (SEC Rule barring fraud claims against forward-looking statements when supported by a reasonable basis in fact).

The plaintiffs respond that some of the statements complained of were outright falsehoods about historical fact. For example, the plaintiffs cite press releases in which Rastogi and Holden stated that Sabratek had already addressed the FDA's regulatory concerns. (*See* Compl. at ¶¶ 92 ("'We are [sic] frankly surprised when we got this warning letter,' said [defendant] Rastogi. 'The issues had all been addressed before we got the [December 1997 FDA warning] letter.'"); 127 ("'There were no safety concerns about the company's products,' which

include heparin and saline-filled syringes, Holden said [in response to the August 1998 FDA warning letters].").)

Additionally, the plaintiffs point to statements about Sabratek's flush-syringe production in various SEC filings. (*See* Compl. at ¶¶ 100 (statements in Sabratek's registration statement and prospectus regarding its sale of convertible notes); 102-04 (statements in Sabratek's FY 1997 Form 10-K).) The plaintiffs here complain that Sabratek affirmatively misrepresented that it had a quality assurance program and had complied with all federal regulations.

The plaintiffs also complain about the individual defendants' sins of omission, specifically that the statements contained in the SEC filings did not reveal that Sabratek was selling the syringes without an approved 501(k) application, that the FDA was requiring such approval, and that the 510(k) application was not likely to be approved. The plaintiffs contend that these statements and omissions were material because Sabratek's rosy financial forecasts covered up the danger to its earning potential represented by the likelihood that its flush syringe product line, which accounted for nearly 25% of Sabratek's sales by November 1998, would be shut down. (*See also* Compl. at ¶ 129 ("In later September and early October [1998], senior Sabratek management gave highly upbeat presentations before two analyst-sponsored [Bear Sterns and First Union] healthcare conferences.").)

Initially we note, although the individual defendants do not argue, that the complaint clearly shows that Sabratek's regulatory difficulties were known by the investing public. The complaint cites at least two newspaper articles written about that very subject. (*See* Compl. at ¶¶ 92 (citing a January 13, 1998 news service release announcing the December 1997 FDA warning letter); 126 (citing a September 8, 1998 news service release announcing the August

1998 FDA warning letters).)  A plaintiff cannot credibly claim to be misled by a company's

attempt to hide negative information when that same information is publicly available via

alternate channels.  *See Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995) (a

company's failure to reveal information already in the public domain is not securities fraud);

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) (same).

Be that as it may, the complaint fails to state a claim for securities fraud against the

individual defendants' statements regarding the flush syringe product line and the FDA approval

process.  First, the affirmative statements in the SEC filings (*i.e.*, that Sabratek and its

subsidiaries operated an internal quality assurance program) are far too attenuated from the

alleged regulatory problems at the flush syringe manufacturing facility to establish fraud.  Nor do

the "quality assurance" statements pretend that Sabratek's internal evaluations were sufficiently

stringent to satisfy FDA regulations or that the internal evaluations would guarantee FDA

approval.  In fact, in each of Sabratek's SEC filings submitted to this Court, the company took

pains to warn investors that

> [i]f in the future the FDA concludes that current, modified or new products manufactured
> and distributed by the Company require that the products be relabeled, require 510(k)
> clearance, require new drug approval, or other regulatory approval, the FDA could
> prohibit the Company from manufacturing and/or distributing these products until the
> Company made the necessary submissions and obtained any required approvals.

(R. 93, Defs.' Ex. K, FY 1997 Form 10-K at 11 (filed on 3/26/1998); *see also* R. 93, Defs.' Ex.

A, March 17, 1997 Form S-1 Registration Statement at 10 ("Rocap currently manufactures and

distributes its products without any FDA approvals . . . . The FDA could also take regulatory

action against the Company for the Rocap division's manufacture and/or distribution of

products."); R. 93, Defs.' Ex. J, July 23, 1997 Form S-3 Registration Statement at 7-8 (same).)

Moreover, Sabratek's statement that it complied with all federal regulations, insofar as its production of flush syringes is concerned, was true. In April 1997, the FDA shifted gears on its classification of the flush syringes, requested a 510(k) application from Sabratek, and told Sabratek that it would take no action against production and distribution of the syringes until it acted on the 510(k) application. Sabratek promptly submitted an application and, in accordance with the FDA's representation, continued selling the syringes until the FDA rejected the application, at which time Sabratek stopped selling the syringes. The plaintiffs make no factual claims supporting their contention that this course of action violated federal regulations, which could have made the statements in Sabratek's SEC filings false.

Further, the complaint is notably vague about how or why the individual defendants knew or should have known that the FDA was going to deny Sabratek's initial 510(k) application for the flush syringe product line. Simply receiving a number of letters from the FDA listing regulatory shortcomings does not portend ultimate FDA denial of the recipient's application, as demonstrated by the FDA's ultimate approval of Sabratek's revised 510(k) application. The complaint also fails to allege any facts establishing the falsity of the above-quoted statements by Holden and Rastogi that Sabratek had addressed the FDA's written concerns and had no safety concerns of its own. Again, the defendants' belief that Sabratek had adequately addressed the FDA's concerns, although obviously mistaken, was not obviously false. The plaintiffs plead no additional facts demonstrating the falsity of Rastogi and Holden's statements.

Finally, given the absence of factual allegations that Sabratek's affirmative statements were false or that its omissions were material, there is no basis for the plaintiffs' claim that Sabratek's optimistic financial predictions were unreasonable in light of the FDA's actions

regarding the flush syringes. Forward-looking statements, which the financial predictions clearly were, are not fraudulent unless the "projection lacked any reasonable basis at the time it was made." *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 599 (7th Cir. 1995); *see also DiLeo*, 901 F.2d at 628 ("There is no 'fraud by hindsight.'").

In sum, the plaintiffs have failed to adequately allege fraud with regard to the individual defendants' handling of the company's regulatory problems. For this reason, we grant each individual defendant's motion to dismiss this claim.

## II. Sabratek's Accounting Practices

The individual defendants level two charges against the plaintiffs' fraudulent accounting practice claims. First, they argue that the complaint engages in "group pleading," in essence making general allegations of fraud without specifically identifying how each individual defendant was involved in the allegedly fraudulent activities. Second, the individual defendants contend that the complaint does not allege particular facts giving rise to a strong inference that any of them acted with the requisite intent, namely recklessly.

### A. Group Pleading

The plaintiffs sue these defendants both directly, as the individuals directly responsible for the allegedly false and misleading statements complained about, and indirectly, as "control persons" responsible for Sabratek's general operations, including oversight of financial reports to the SEC, audits, and press releases. As such, the plaintiffs maintain that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes."[7] (Compl. at ¶ 27.)

---

[7]  Nevertheless, the complaint contains numerous allegations specifically identifying the
(continued...)

The individual defendants, on the other hand, argue that "group pleading" was never appropriate under Rule 9(b) and that now the PSLRA outright forbids it. Rule 9(b) requires plaintiffs to "specify which defendants said what to whom and when, unless they [can] show . . . that the requisite information [is] within the defendant's exclusive knowledge." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 127 F.3d 467, 471 (7th Cir. 1999) (applying Rule 9(b) to common law fraud claims) (quotation omitted); *see also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) ("[T]he amended complaint simply treats all the defendants as one; such 'lumping together' of defendants is clearly insufficient [under Rule 9(b)] to state a RICO claim."). In the context of a securities fraud case, the Seventh Circuit affirmed the dismissal of a complaint "bereft of any detail concerning who was involved in each allegedly fraudulent activity," explaining that "'[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient.'" *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (quoting *Design Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ill 1987)).

We do not believe, however, that these decisions – *Ackerman*, *Goren*, and *Sears* – dictate the outcome of this case. In each of those cases, the plaintiffs utterly failed to provide any details regarding the alleged fraudulent activities. *See Ackerman*, 172 F.3d at 471 ("Although the

---

[7](...continued)
individual defendant who made or was responsible for the purportedly false representations. (*See, e.g.*, Compl. at ¶¶ 48(c)(ii) (Jordan authorized a $1.2 million consignment sale that was later documented as a sale); 101 (Padda, Rastogi, Levitas, Holden and Skooglund signed Sabratek's FY 1997 Form 10-K, which reported artificially inflated sales); 127 (Holden downplayed Sabratek's regulatory difficulties).) We address the plaintiffs' specific allegations below and, here, deal only with the propriety of group pleading.

complaint alleges in general terms that the defendants inspired, encouraged, and condoned [the fraudulent activities], it neither associates a particular defendant with a particular set of statements (oral or written) . . . nor specifies the contents of those statements."); *Goren*, 156 F.3d at 730 ("These conclusory allegations fail to specify the time, place and content of any of the misrepresentations attributed to these defendants."); *Sears*, 912 F.2d at 893 ("The plaintiffs fail to state in any detail what misrepresentations were made by the defendants, to whom these misrepresentations were made, when these misrepresentations were made, or how these misrepresentations furthered the alleged fraudulent scheme.").

Here, on the other hand, the plaintiffs have supplied ample detail as to the contents of the misrepresentations, the date and location of each misrepresentation, and how the misrepresentations furthered the alleged fraudulent scheme. Essentially, the only detail missing from the group pleading paragraphs, (Compl. at ¶¶ 26-30), is how each individual defendant was supposed to know that the statements complained about were false, and even that is alleged generally: "Because of their Board membership and/or executive and managerial positions with Sabratek, each of the Individual Defendants had access to . . . adverse undisclosed information about Sabratek's business prospects and financial condition and performance," (Compl. at ¶ 29). In other words, based on their positions with the company, the individual defendants had access to inside information that belied the company's public statements. We believe the complaint provides sufficient detail to satisfy the Rule 9(b) standard.

The individual defendants contend, however, that the PSLRA raised the pleading bar to such an extent that the complaint must "plead facts establishing scienter both <u>person by person</u> and <u>act by act</u>." (R. 133, Joint Reply Mem. at 10.) Section 78u-4(b)(2) declares "the complaint

shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Under the plain language of the statute, pleading scienter based exclusively on a defendant's corporate position is insufficient to survive a motion to dismiss. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' position within the company"). The simple fact of a defendant's status as an officer or director of a company, without more, does not give rise to a strong inference that that defendant knew or recklessly disregarded the falsity of statements released by the company.

Our decision in *Discovery Zone*, relied on by the plaintiffs, does not pertain under the new standards imposed by the PSLRA. *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924 (N.D. Ill. 1996). Clearly, the PSLRA abrogates the standard we articulated there. *See id.* at 937 ("[Scienter] is sufficiently pled if the complaint 'affords a basis for believing that plaintiffs could prove scienter.'") (quoting *DiLeo*, 901 F.2d at 629). Moreover, the plaintiffs in *Discovery Zone* did not exclusively rely on the defendants' status as corporate officers to establish scienter, but also pled other suspicious actions by the defendants suggesting fraud. *Id.*

Plaintiffs also direct our attention to *Danis*, which rejected an attack, lodged under the PSLRA, on the group pleading doctrine. *Danis*, 73 F. Supp.2d at 939 n.9. We respectfully disagree with the *Danis* decision on this issue. In *Danis*, the court refused to "abolish all remnants of notice pleading and the liberal standards under which motions to dismiss are viewed" absent direction from the Seventh Circuit. *Id.* We believe, however, that Congress has instructed us to do just that: Congress decreed that "the complaint *shall*, with respect to each

[fraudulent] act . . ., state with particularity facts . . . that the defendant acted with the required state of mind." § 78u-4(b)(2). This language, even more than Rule 9(b), obliterates notice pleading in private securities fraud cases and, by implication, the liberal standards typically used to decide motions to dismiss.

To the extent the plaintiffs plead scienter based exclusively on an individual defendant's position in Sabratek's hierarchy, their claims must be dismissed. Although the plaintiffs do in some cases rely only on an individual defendant's position to allege knowledge of or reckless indifference to fraud, the problem is not universal. As we noted above, the complaint contains numerous allegations specifying activities by the individual defendants that may give rise to a strong inference of recklessness.

## B. Scienter

To survive the current motions, then, the complaint must allege particular facts giving rise to a strong inference that each individual defendant either intended to deceive Sabratek's investors or recklessly disregarded the fraudulent nature of Sabratek's public statements. The plaintiffs must therefore adequately allege facts that, if proven, would establish that the individual defendants knew, or recklessly ignored, that Sabratek (1) misrepresented $39 million in research and development expenditures as assets and (2) declared present income from future or non-existent sales, thereby artificially inflating Sabratek's reported worth and, thus, the price of its stock.

The plaintiffs rely on two basic categories of fact to allege scienter: violations of generally accepted accounting principles ("GAAP violations") and motivation. The GAAP violations in turn breakdown into allegations regarding Sabratek's improper sales recognition

practices with regard to its line of infusion pumps and its improper accounting of research and development expenses.

We conclude that none of the plaintiffs' allegations regarding Sabratek's recognition of infusion pump sales give rise to a strong inference of fraudulent intent. Nevertheless, with respect to some of the individual defendants, the magnitude of Sabratek's misstatement of assets and earnings adequately supports an inference of reckless or intentional misrepresentations.

## 1. Generally Accepted Accounting Principles

The plaintiffs allege that the individual defendants engaged in various accounting practices that violated generally accepted accounting principles ("GAAP"). Specifically, the plaintiffs assert that Sabratek recognized income from "phony" sales of infusion pumps and that it reported research and development expenditures as intangible assets, such as licensing agreements and loans.

In general, bare allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. *Danis*, 73 F. Supp.2d at 940; *Rehm*, 954 F. Supp. at 1255; *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999). Instead, the "complaint must also show facts supporting an inference that [the] defendants recklessly disregarded the deviance or acted with gross indifference to the misrepresentations in its financial statements." *In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, at *14 (N.D. Ill. Mar. 8, 2000). Facts relevant to this determination include the magnitude of the accounting error, facts showing that the defendants had prior notice of the error, and whether a defendant was responsible for calculating and disseminating the financial information.

### a. Sabratek's Infusion Pump Sales

As to the infusion pump sales, the plaintiffs predominantly complain about Sabratek's "channel stuffing" activities – that is, shifting income from a later reporting period to an earlier reporting period by recognizing sales upon shipment, even when the shipment is of products not yet purchased (*e.g.*, consignment sales and inventory parking). The plaintiffs also allege that Sabratek reported income on nonconforming and defective shipments and failed to account for customer rebates and credits.

Unfortunately, the plaintiffs' allegations regarding income recorded from these sales are lacking in the type of detail necessary to support a strong inference of scienter. Although the plaintiffs provide specific examples of consignment sales, discount sales, and inventory parking, (Compl. at ¶ 48(a)-(e)), nowhere does the complaint relate these activities to any specific financial statement. In other words, it is not even clear that Sabratek committed GAAP violations with respect to these sales – particularly when one considers that Sabratek notified the investing public that it recognized sales upon shipment. (*See, e.g.,* Defs.' Ex. K, FY 1997 Form 10-K at 27.) There is nothing inherently suspect with consignment and discount sales, *see Greebel*, 194 F.3d at 202-203, and the plaintiffs have not alleged facts showing that in this case the defendants acted improperly. Although allegations that certain practices violate GAAP may be sufficient to plead a misrepresentation, such assertions are insufficient to demonstrate a strong inference of fraudulent intent.

Also lacking from the complaint is any allegation that the individual defendants who authorized these sales practices – the complaint specifically names only Beal and Jordan – played any role in calculating or disseminating Sabratek's earnings statements: neither Beal nor Jordan

signed-off on Sabratek's financial reports to the SEC and no other allegations link these defendants to Sabratek's earnings statements. Likewise, the complaint does not allege that those defendants responsible for disseminating Sabratek's financial statements were involved in or knew about these sales practices.

With regard to allegations that Sabratek failed to account for rebates and credits, the plaintiffs offer even fewer specifics. In the lone paragraph providing any information about this allegation, (Compl. at ¶ 48(f)(ii)(b)), the complaint simply states that Sabratek induced its distributors to order infusion pumps by promising credits and rebates and then later attempted to renege on its promises. This claim is impossibly vague – it doesn't even state that Sabratek reported the full purchase price of the pumps as revenue, much less when the promises were made, the value of the rebates and credits, when the sales were reported, or any other information even faintly suggesting improper activity by Sabratek.

The plaintiffs also claim that Sabratek reported sales on nonconforming goods. Again, only one paragraph in the complaint sets forth any facts relating to this allegation. (Compl. at ¶ 48(d).) There the complaint states that Sabratek shipped $150,000 worth of "stale" infusion pumps (*i.e.*, pumps with out-of-date inspection stickers) and then, instead of sending "fresh" pumps, sent new stickers falsely stating that the pumps had been recently inspected. Not only do the plaintiffs fail to allege how these pumps were accounted for and what ultimately happened with the pumps, but it appears that there was no wrongdoing with respect to these pumps. According to the complaint, pumps must be inspected annually: these pumps were inspected "4/98" and shipped six months later, "in or around October of 1998." (Compl. at ¶ 48(d).) In other words, the pumps were not in fact "stale."

Finally, the plaintiffs make a series of allegations that Beal and Jordan regularly fleeced Sabratek's distributors by making sales directly to the distributors' customers and by violating exclusivity agreements. (Compl. at ¶ 48(f).) Although, if true, these practices may be unethical and poorly calculated to further Sabratek's business interests, we do not see how they support an inference that the defendants recklessly disregarded financial reports overstating Sabratek's earnings.

In sum, the complaint does not tie any of these sales to any misrepresentation: it does not reveal when the sales were actually reported as revenues; by what amount, if any, the sales were over reported[8]; or any other improper impact these sales may have had on Sabratek's financial reports. For this reason, no inference of fraudulent intent can be garnered from these allegations.

### b. Sabratek's Research and Development Expenditures

The plaintiffs allege that the individual defendants overstated Sabratek's income from April 1, 1997 through March 31, 1999 by approximately $39 million by mischaracterizing research and development expenditures as "intangible assets." Specifically, instead of reporting these expenditures as expenses, Sabratek improperly denoted $39 million as loans, licensing fees, exclusive product rights, and marketing agreements. By falsely accounting for these funds,

---

[8] The $39 million overstatement of earning, mentioned earlier in the fact section, is tied exclusively to the plaintiffs' research and development expenditure allegations. (*See* Compl. at ¶¶ 54, 54 n.5.) Specifically, the plaintiffs identify the amount of money each R & D entity received, add those numbers up, and conclude that "[t]his $41.5 million sum – after taking into account approximately $2 million in amortization writedowns, [etc.] . . . essentially equals the 'approximately $39 million' in accounting restatements that the Company announced on October 7, 1999." (Compl. at ¶ 54.) Therefore, we analyze the "$39 million overstatement" fact in the context of the research and development funds allegations and not here.

Sabratek was able to report significant net earnings, rather than significant losses during the relevant time periods.

In support of their contention that the individual defendants acted with the required scienter in falsely accounting for these funds, the plaintiffs rely on the magnitude of the overstatement of assets (or understatement of expenses); Sabratek's admission on October 7, 1999 that it had overstated earning by $39 million; statements by Padda that Sabratek's auditor, KPMG, had helped get Sabratek's research and development expenses "off the books"; and the utter lack of documents supporting the reported "intangible assets." Additionally, the plaintiffs point to the remarkable increase in Sabratek's "intangible assets," which at the end of FY 1996 accounted for only 1% of its total assets but by FY 1998 had jumped to 21% of its total assets; the fact that Unitron, which received the lion's share of the money, had no marketable product and was at least 18 months away from going to market with the product Sabratek supposedly licensed; and Sabratek's agreements with GDS and Unitron for the option to acquire 100% of their assets.

With respect to Padda, Rastogi, Holden, Levitas, Capponi, Skooglund, Lomicka, and Lautman – that is, each individual defendant except Jordan, Beal, and Mandell – we believe these allegations are sufficient to establish a strong inference that they either deliberately mischaracterized expenses as assets or recklessly disregarded the veracity of Sabratek's financial reports of its assets and earnings.

First, we explain our exclusion of Jordan, Beal, and Mandell, which should help explain our conclusion regarding the rest of the individual defendants. Absolutely nothing in the complaint even remotely suggests that Jordan, Sabratek's Senior Vice President of Sales and

Marketing, Beal, Sabratek's Vice President of Sales, or Mandell, Sabratek's President of the

Rocap Division, played any role in structuring the deals between Sabratek and the four research

and development entities or in calculating the financial impact of those deals; none of the three

signed Sabratek's SEC filings, none participated in or arranged audits, none is alleged to have

engaged in conversations about the deals. Furthermore, none of the three executives occupied a

position obviously involved in Sabratek's finances, development, acquisitions, or even overall

administration. In other words, the plaintiffs do not allege facts showing that Jordan, Beal, or

Mandell would have, or should have, been aware of the nature, extent, and impact of Sabratek's

deals with the research and development entities.

On the other hand, the other individual defendants all were in positions to know the facts

upon which the plaintiffs rely to show scienter. Whereas the President of Sabratek's Rocap

Division (Mandell) would have no reason to question a licensing agreement with or loan to

Unitron, members of the audit committee (Lomicka and Lautman) would, particularly given the

radical increase in Sabratek's reported "intangible assets." Likewise, the Vice President of Sales

(Beal) would have no reason to know about a credit agreement with Collaborations in

Healthcare, but the Chief Financial Officer (Holden), Principal Accounting Officer (Skooglund),

and Chief Operating Officer (Rastogi and, later, Capponi) would, especially considering the

amounts of money involved. Additionally, each of the other individual defendants signed and

disseminated the misleading financial reports.

The specific facts alleged regarding the circumstances surrounding Sabratek's alleged

mischaracterization of the research and development expenses raises a strong inference of

intentional or reckless falsification of Sabratek's financial statements by those with reason to

Page 23

know of those circumstances. For this reason, we deny the motions to dismiss by Padda, Rastogi, Holden, Levitas, Capponi, Skooglund, Lomicka, and Lautman. On the other hand, the complaint does not allege facts from which we can infer that Jordan, Beal, and Mandell knew or should have known about the circumstances surrounding Sabratek's accounting of the research and development expenditures. Thus, we turn to whether the plaintiffs' allegations regarding motive and opportunity are sufficient to raise a strong inference of intent with respect to Jordan, Beal, and Mandell.

## 2. Motive and Opportunity

The individual defendants focus their challenge to the plaintiffs' accounting claims almost exclusively on the "motive and opportunity" allegations. We agree with the defendants that allegations regarding their desire to (1) maximize Sabratek's earning potential on corporate debt offerings, (2) retain their positions, and (3) earn production bonuses are insufficient facts from which to infer any level of scienter. These are the goals of all corporate executives; as such, they do not even remotely suggest fraudulent motivation. *See, e.g., In re Next Level Sys., Inc. Sec. Litig.*, No. 97 C 7362, 1999 WL 387446, at \*9 (N.D. Ill. Mar. 31, 1999) ("Allegations of motives that are generally held by similarly positioned executives and companies are insufficient to sustain a claim under the securities laws.") (quotation omitted); *see also Shields v. Cititrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (Allegation that "defendants made fraudulent statements intended to inflate the stock price so that they could protect their executive positions and the compensation and prestige they enjoy" is insufficient to plead recklessness.); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (Allegations that "defendants acted 'for the purpose of creating an artificially inflated picture of DSC's financial

and operating conditions, increasing the Company's market share and gaining a competitive advantage, maintaining an artificially inflated price for the common stock[,] . . . preserving defendants' positions, perquisites and emoluments of office, securing, maintaining and/or increasing compensation for themselves, and/or inflating the value of their shares'" are insufficient to plead recklessness.) (quoting complaint).

On the other hand, allegations of insider trading, including a secondary offering by inside shareholders, certainly can be relevant to the issue of a securities fraud defendant's state of mind. *See, e.g., Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) ("In some cases, an insider's suspicious sale of holdings . . . may support an inference of bad faith and scienter."). The mere fact that a company's executives and directors sold stock during the class period is not enough: "Rather, a plaintiff must show that the sale was drastically out of line with prior trading practices and that the sale was timed to maximize personal benefit from undisclosed inside information." *In re Systems Software Assocs., Inc. Sec. Litig.*, No. 97 C 177, 2000 WL 283099, at *13 (N.D. Ill. Mar. 8, 2000) (citing *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978); *Rehm*, 954 F. Supp. at 1254); *see also In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) ("Indeed, allegations that corporate officers engaged in insider sales at unusual or suspicious levels is probative of motive.") (quotation omitted). Thus, to adequately allege scienter based on insider trades, the plaintiffs must set forth facts establishing that the individual defendants' sales were suspicious because of the timing and amount of the sales.

Here the plaintiffs, through no fault of their own, cannot show that the individual defendants' stock sales were drastically out of line with prior sales: none of the individual defendants was allowed to sell his stock prior to the sales noted in the complaint. Sabratek went

public in June 1996. Under the terms of its initial public offering, Sabratek imposed a 180-day "lock up" prohibiting sales by corporate insiders. Thus, a prior history of sales does not exist and we can examine only the level and timing of the insider sales. We focus our analysis on Jordan, Beal, and Mandell.[9]

Beal sold no stock during the purported class period.[10] Obviously, having made no insider sales, we can infer no intent by Beal to commit securities fraud.

Mandell sold 87,488 of the 131,593 shares he received as part of the purchase price of Rocap and earned approximately $2.64 million; Jordan sold 219,136 shares and reaped a total sale price of approximately $5.4 million. In their response memorandum, the plaintiffs claim Jordan received 72,802 outright; stock options to purchase 149,428 shares at $4.76, of which only 101,502 were exercisable prior to the end of 1998 (the relevant period of his sales), and an additional 100,000 stock options at $22, of which only 25,000 were exercisable prior to the end of 1998. (R. 122, Pls.' Mem. at 40.) These numbers simply do not add up. According to the plaintiffs, by the end of 1998, Jordan had only 199,304 shares to sell (72,802 + 101,502 + 25,000), but actually sold 219,136 shares.

Furthermore, the plaintiffs do not attempt to link Jordan and Mandell's insider sales to any specific misleading statement by Sabratek regarding its financial health. The complaint lists

---

[9] Having concluded that the plaintiffs adequately alleged scienter against the other individual defendants, we need not carefully scrutinize their stock sales. We note, however, that Capponi, Skooglund, Holden, and Lomicka engaged in VERY modest sales of their personal holdings. With respect to these four defendants, we could draw absolutely no inference of fraud from their inside trades.

[10] As far as we can tell, he owned only 78 shares. (*See* Defs.' Ex. U, Beal Form 3.) Neither the complaint nor the plaintiffs' response memorandum mentions sales by Beal.

each individual's sales by date, (Compl. at ¶ 200), whereas the plaintiffs' response memorandum simply lumps each individuals' sales together and argues that his gross earnings establishes scienter, (R. 122, Pls.' Mem. at 38-44). But Jordan sold stock on 14 separate days over a 16-month period; somewhat less extreme, Mandell sold his shares on eight different days over a seven-month period. In fact, Jordan and Mandell did not conduct any sales during the same month.[11] It is impossible to infer, based on these facts, that Mandell and Jordan were part of a plot to run up stock prices for their own benefit.

Both Jordan and Mandell vigorously declaim any inference of scienter based on their stock sales. Mandell notes that "it is entirely natural for an officer who received shares in connection with the purchase of [his] business [*i.e.*, Rocap] to sell those shares [and] recover a portion of the purchase price." (R. 146, Mandell Reply Br. at 4.) Further, he points out that he sold the shares when they became available under the terms of the asset purchase agreement and his employment contract. (*Id.* at 5.) Jordan likewise claims that he sold his stock either when it became "unlocked" or when the options vested. (R. 141, Jordan Reply Br. at 4-5.)

The absence of any allegations linking Sabratek's allegedly false financial representations with sales by Mandell and Jordan, especially when viewed in light of the fact that they sold their stock when it became available to them to sell, definitively establishes that the plaintiffs have not adequately alleged scienter against Mandell and Jordan. "A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events." *In re Burlington Coat*

---

[11] Jordan sold stock in April, May, and November 1997, then in February, May, and October 1998. Mandell sold stock in August and September 1997, then in March 1998.

*Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3ᵈ Cir. 1997). Here the plaintiffs present no facts from which we can infer anything other than a normal course of events.

## III. Control Person Liability

Several of the individual defendants contend that the complaint fails to state a claim for control person, or secondary, liability for securities fraud against them. 15 U.S.C. 78t (§ 20(a) of the 1934 Act). First, Holden argues that, because the plaintiffs failed to state claim for § 10(b) liability, their control person liability claim necessarily fails. Holden's basic premise is flawed. *See Donohoe v. Consolidated Operating Prod. Corp.*, 30 F.3d 907, 909 (7ᵗʰ Cir. 1994) (principals not charged with direct § 10(b) liability may still be liable as control persons). Even so, we have concluded that the plaintiffs successfully pled a § 10(b) claim against Holden. Thus, Holden's motion to dismiss the § 20(a) claim is denied.

Second, Capponi, Jordan, Beal, Mandell, Lomicka, and Lautman argue that the plaintiffs pled no facts establishing that they are control persons. The Seventh Circuit has set forth a two-prong test for determining control person liability: the individual defendants must (1) have exercised actual control over the general operations of Sabratek and (2) have had the ability and power to direct (or prevent) the fraudulent statements at issue here. *See, e.g., Donohoe*, 30 F.3d at 911-12; *Discovery Zone*, 943 F. Supp. at 943. Thus, we look to the complaint to ascertain whether the plaintiffs have adequately alleged § 20(a) liability.

Initially we note that § 20(a) does not have a scienter requirement.[12] In fact, liability is premised on a defendant's position in the corporate hierarchy. Additionally, we know of no

---

[12] Good faith, however, is an affirmative defense to a § 20(a) claim.

heightened pleading standards applicable to § 20(a) claims: the defendants do not refer to any and our independent research revealed none. Thus, we apply the Federal Rules' liberal pleading requirements to this claim and conclude that the complaint adequately alleges § 20(a) liability against each of the individual defendants. (*See, e.g.,* Compl. at ¶¶ 217-18.) Although we have significant reservations about the plaintiffs' ability to prove these allegations, that is a question we may not decide on the pleadings.

## CONCLUSION

For these reasons, we grant in part and deny in part each individual defendant's motion to dismiss. (R. 81-1, 82-1, 83-1, 85-1, 86-1, 87-1, 88-1, 89-1, 90-1, and 91-1.) Specifically, we dismiss with prejudice all of the plaintiffs' claims regarding FDA approval of the flush syringe 510(k) application and Sabratek's revenue recognition practices. We dismiss the research and development expenditures claim with prejudice with respect to Jordan, Beal, and Mandell, but deny the motions to dismiss the research and development expenditures claim brought by Padda, Rastogi, Holden, Levitas, Capponi, Skooglund, Lomicka, and Lautman. Finally, we deny the motions to dismiss the plaintiffs' control person liability claim brought by Holden, Capponi, Jordan, Beal, Mandell, Lomicka, and Lautman.[13]

Additionally, we deny Stephen Axel's motion to dismiss, (R. 79-1), as moot because Axel was dismissed from this action by agreement of the parties. (*See* R. 109, Order of Mar. 21, 2000.)

Finally, we grant the plaintiffs' request, contained in the response memorandum, (*see* Pls.' Mem. at 51 n.34), to amend the complaint for a sixth time,[14] but only to the extent allowed

---

[13] The other defendants – Padda, Rastogi, Levitas, and Skooglund – did not seek dismissal of the plaintiffs' § 20(a) claim.

[14] On January 21, 1999, the plaintiffs filed the original complaint, (R. 1); on June 7, 1999, they filed an amended complaint, (R. 23); on October 15, 1999, the filed the second amended complaint, (R. 35); and on November 17, 1999, they filed the third amended complaint, (R. 42). Then, on March 30, 2000, the plaintiffs filed a so-called "Omnibus Motion," (R. 113), which among other things sought to amended the named lead plaintiffs. (We granted that motion on April 11, 2000. (R. 114.)) As this chronology shows, to date the plaintiffs have presented five different pleading documents. Thus, the next amendment will be the sixth, even though it probably will be styled the fourth amended complaint.

by the rulings made here. The plaintiffs filed their first complaint more than 16 months ago; they have had plenty of time – and opportunity given that the defendants sought dismissal of each complaint filed – to get it right. Plaintiffs alleging fraud are required to get their ducks in line before filing a *first* complaint, much less their sixth. *See Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) ("The purpose (the defensible purpose anyway) of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint.").

For these reasons, we will not allow the plaintiffs a fifth opportunity to attempt to plead the allegations we have dismissed in this opinion; as stated, those claims are dismissed with prejudice. The current third amended complaint, (R. 42), is therefore dismissed without prejudice to filing another amended complaint strictly comporting with the rulings made in this opinion. This amended complaint is due on or before August 4, 2000. The Court will hold a status hearing on August 9, 2000 at 9:45 a.m.

Entered:

Judge Ruben Castillo
United States District Court

Date: June 12, 2000